**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ramon HERNANDEZ–RODRIGUEZ,**
**Defendant–Appellant.**

**No. 93–2311.**

United States Court of Appeals,
Tenth Circuit.

June 6, 1995.

---

William D. Fry, Asst. Federal Public Defender, Las Cruces, NM, for defendant-appellant, Ramon Hernandez–Rodriguez.

Kelly H. Burnham, Asst. U.S. Atty. (John J. Kelly, U.S. Atty., with her on the brief), Las Cruces, NM, for plaintiff-appellee, U.S.

Before BALDOCK and BRORBY, Circuit Judges, and BROWN, Senior District Judge.**

BROWN, Senior District Judge.

Following jury trial, the appellant Ramon Hernandez–Rodriguez (Hernandez) was convicted of importing less than fifty kilos of marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(4), and of possession with intent to distribute that marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). In this appeal, he claims that his Fourth Amendment right to be free of unreasonable searches and seizures was violated when he was searched at the international border, and he also claims that the government failed to prove that he knowingly transported marijuana into the country.

Prior to trial, Hernandez filed a motion to suppress the marijuana seized at the border; an evidentiary hearing was held, and the district court denied the motion upon a finding that appellant was without standing to complain of the search and seizure. A review of the evidence presented at this hearing and at trial supports the following factual basis for the seizure and arrest of appellant Hernandez.

Columbus, New Mexico, is a small town situated near the international border of the

** The Honorable Wesley E. Brown, Senior District Judge, District of Kansas, sitting by designation.

United States and Mexico. It sits right next to Palomas, Mexico, and many people travel between the two towns. At 7:00 p.m. on May 5, 1993, (Cinco de Mayo, a major holiday in the Republic of Mexico), Hernandez drove a 1978 Thunderbird from Palomas into the primary inspection lane at the Columbus, New Mexico, Port of Entry. His only passenger was one Jesus Ortiz–Ortiz, appellant's co-defendant.[1] This primary inspection lane is 50 to 75 feet from the actual border fence. At this port of entry, government agents have responsibilities as immigration inspectors to ensure that all persons entering the United States are entering legally; and the agents also act as customs inspectors, checking vehicles to insure that no contraband is carried into the United States.

Inspector Torres asked the occupants of the vehicle about their citizenship, and both Hernandez and Ortiz presented valid resident alien cards. As he reached into the vehicle to get the cards, Torres noted a strong odor of perfume or cologne, as if someone had broken an entire bottle of it in the car. This odor indicated to Torres that there was probably contraband in the vehicle.

When questioned, Hernandez told Torres that they had come from Palomas, where they had been visiting bars and that they were going into Columbus, New Mexico. Another inspector, Martinez, checked the license plate on the Thunderbird and entered the number into the computer. Martinez also noted the strong perfume odor coming from the vehicle. Martinez asked who owned the car and was told that it belonged to a "friend." Martinez asked this question twice because he had been working at the Columbus Port of Entry for over four years and had seen Ortiz pass through many times but never before in the Thunderbird.

At the suppression hearing, Martinez also testified that as a routine part of his duties he ran Hernandez' name and date of birth through a computer check which resulted in a "positive hit that he had been referred to Customs before for zero tolerance, drugs."[2] Upon receiving such a report, a customs agent automatically refers the car or individual to a secondary station for further investigation.

At the secondary inspection station, Hernandez and Ortiz got out of the car at the request of Inspector Greifinger, who began his inspection in the back seat. He immediately found that the seat was not bolted down and, upon lifting it, he discovered packages of marijuana hidden under the bottom of the seat. A later inspection with a drug-detecting dog led to discovery of additional marijuana hidden in the top portion of the back seat.

The marijuana seized totalled 40.6 pounds. Such an amount indicates that the marijuana was possessed with the intent to distribute. At trial, Customs Special Agent Briseno, who was in charge of the investigation, testified that its value ranged from $700 to $1,100 a pound, depending on where it was sold in the United States. It thus appears that the contraband was worth from $28,000 to $44,000.

Agent Briseno determined that the registered owner of the Thunderbird was Genardo Nunez, a resident of Palomas, Chihuahua, with a post office address in Columbus, New Mexico. All efforts to contact Nunez were unsuccessful. Used shock absorbers were found during an inventory of the contents of the Thunderbird and, at the time of his arrest at the port of entry, Ortiz was found to have four $100 bills in his possession.

Briseno questioned Hernandez and Ortiz separately after their arrest. Hernandez claimed that he set off at midday on a nation-

---

**1.** The appeal of appellant's co-defendant appears as *United States of America v. Ortiz–Ortiz*, 57 F.3d 892 opinion affirming conviction, filed this date.

**2.** The computer screen displayed the following information to Martinez—"USC REFERRAL Z TOL," which suggested that Hernandez had been "referred" to the U.S. Customs Service for some sort of "zero tolerance" offense. This could pos-

sibly have been for possession of a small quantity of marijuana. "Zero tolerance" offenses are rarely prosecuted, and there was no evidence that defendant had been arrested for any such offense.

After the suppression hearing, and prior to trial, defendant filed a Motion in Limine to exclude any evidence of a "TECS HIT," and this motion was sustained.

al holiday in Mexico to have his car repaired in Palomas, but he met Ortiz and they visited a series of bars and drank six or seven beers each. About 5:00 p.m., they delivered the car to a Palomas mechanic for repair. The car was dismantled, and the mechanic found new shock absorbers were needed. Hernandez claimed he had $30 cash available for repairs at the outset, but he had spent half that amount drinking beers. Hernandez told Briseno that he and Ortiz started out on foot to buy new shock absorbers in Columbus, New Mexico, and along the way two people pulled up in the Thunderbird and told them—"well, you know, here's my car, go ahead and take it." The statement given by Ortiz to Briseno was essentially the same.

Hernandez gave conflicting stories to the customs agents, to the court during the suppression hearing, and to the jury about his reason for being in the vehicle and his relationship to its owner. He first told agents Martinez and Briseno that the car belonged to a "friend." During the suppression hearing and at trial, he testified that he did not know the people who offered him the use of the car.

At trial, Ortiz also testified that two strangers who appeared to be "good people" had loaned them the car and explained that the $400 he had in his possession came from an unemployment check and a loan of $100 from his father. In addition, the mechanic from Palomas testified that he advised Hernandez to buy American-made shocks across the border because of their superior quality. Mr. Jose Ortiz testified that he had loaned his son $100.00. This was the evidence submitted to the jury.

■■■ In his motion to suppress, defendant claimed that his Fourth Amendment rights were violated by the search at the border, but this motion was denied by the district court upon a finding that Hernandez lacked standing to complain of the search. In spite of his counsel's assurance that the appellant would testify that the vehicle had been loaned to him by the registered owner, Nunez, when called to testify at the suppression hearing, Hernandez testified that he did not know the person who loaned him the car. Under these circumstances, the district court correctly found that Hernandez lacked standing.[3] The court further found that after the initial stop, defendant was justifiably referred over to the secondary inspection station. Such conclusion is supported by the three circumstances relied upon by the district court—first, the strong fragrance which indicated to the inspectors at the first checkpoint that the vehicle was carrying contraband; second, by the message on the monitor that Hernandez had been previously involved with narcotics, and third, the evidence given by Hernandez himself that he did not own the vehicle.

Following this testimony, the court made this finding regarding standing:

... I find this witness' testimony inherently improbable, and I will not accept—I will not believe that somebody whom he didn't know just loaned him a car, so I cannot accept this testimony.

This is a 1978 Thunderbird, so I'm going to find that the defendant has not established standing in this case. Ownership of the automobile or permission—or permission by the owner to use it for the defendant's purposes. So that will be the Court's ruling on the question of finding (sic) (standing). (Tr. 7/20/93, p. 82).[4]

■■■ Hernandez claims that there was insufficient evidence of his knowledge or possession of the marijuana to sustain his conviction. In reviewing this assertion, we adopt the conclusions set out in our opinion

---

3. Hernandez testified in this manner:

  "Q. (by defense counsel) Was that vehicle given to you by someone?
  A. Yes.
  Q. Who gave you that vehicle?
  A. It was two people. I don't know what their names are. * * * *
  Q. So you don't know the name of the person who gave it to you?
  A. No."

4. Routine stops and searches at the border are reasonable under the Fourth Amendment. *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Even if "reasonable suspicion" was required before search, the custom inspectors here acted reasonably, in view of the strong odor in the vehicle, the "zero tolerance" computer alert, and the fact that Hernandez was unable to identify the owner of the vehicle.

in the companion case involving Ortiz, the passenger in the Hernandez vehicle. See *U.S. v. Ortiz–Ortiz,* 57 F.3d 892 (10th Cir. 1995). As there noted, the evidence, both direct and circumstantial, together with all inferences reasonably to be drawn from that evidence was sufficient to support the verdict of guilt. *See U.S. v. McCoy,* 781 F.2d 168, 170 (10th Cir.1985), *and see U.S. v. Chavez– Palacios,* 30 F.3d 1290 (10th Cir.1994). Here, Hernandez and his passenger gave identical improbable statements to the customs agents and to the jury concerning the mysterious appearance of two "good Samaritans" who offered the use of their car to apparent strangers without any arrangements for the return of the vehicle which contained contraband of a minimum value of $28,000. The entire car smelled strongly of perfume, commonly used to mask the odor of drugs, and marijuana was immediately found scarcely concealed under a loose back seat. At the time of arrest, Hernandez had no money, and Ortiz possessed four $100 bills. A reasonable jury was entitled to discredit Hernandez' explanation of how he came to be in possession of the vehicle and its contents and to conclude that Hernandez was engaged in a joint venture with his co-defendant and aided and abetted in the importation and possession of marijuana with intent to distribute the same in violation of the laws of the United States.[5]

The Judgment is AFFIRMED.

---

**5.** All who are involved in a joint venture may be found to be in constructive possession of marijuana. *See U.S. v. Espinosa,* 771 F.2d 1382, at 1392–94 (10th Cir.1985) *cert. denied* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561.