McCULLOUGH, Judge.
 

 *328
 
 The State appeals from an order allowing Jeffrey Castillo's ("defendant's") motion to suppress the search of his vehicle entered by the trial court on 22 April 2015. After careful review, we reverse.
 

 I.
 
 Background
 

 On 26 September 2014, Officer Roy Green, a 15-year veteran Durham Police Department officer assigned to the highway interdiction division of the special operations division was parked on an exit ramp monitoring the southbound lanes of I-85 near the Durham-Orange county border. Officer Green testified that he patrols the I-85 corridor looking for people who might be using that route to move contraband, money, or engage in human trafficking while also stopping and citing routine traffic violators. Officer Green further testified that he has had specialized interdiction training beginning in 2006. The interdiction training teaches him how to look for verbal and non-verbal indicators that the person stopped for a traffic violation might also be engaged in other criminal activity.
 

 During his shift, Officer Green positioned his vehicle, a marked unit with no roof light system, on the exit ramp of Highway 70 which provided him with a clear view of the I-85 South traffic lanes. He noticed a green car traveling at what he estimated as a high rate of speed, so the officer began to follow the car to determine how fast the car was travelling. Officer Green had tested his speedometer and radar to ensure the accuracy of his speedometer at the beginning of the shift, which was important since there was too much traffic at the location he was monitoring for him to use his radar. After pacing defendant's vehicle for enough time and distance to calculate defendant's speed as 72 mph in a 60 mph zone, Officer Green activated his emergency lights and stopped
 
 *329
 
 defendant's vehicle. When defendant observed the officer's lights he abruptly pulled over to the shoulder of the road, startling Officer Green and requiring him to brake to avoid collision.
 

 Officer Green approached defendant's vehicle from the passenger side and asked for his license and registration. Officer Green noticed defendant's hand was shaking uncontrollably as he handed the license to him. Officer Green also smelled a mild odor of air freshener emanating from the interior of the vehicle and observed that defendant was operating the vehicle with a single key, which indicated to Officer Green that defendant
 
 *50
 
 might not be the owner of the car. Officer Green explained that people who loan someone a car will often not give out all of their keys. This was corroborated later during the investigation as the officer validated that an individual from the Jackson Heights or Queens area of New York City was the owner of the vehicle. Upon noticing defendant's extreme nervousness, Officer Green asked defendant where he was going and where was he coming from. Instead of answering, defendant would respond with "huh," requiring Officer Green to re-ask the question. Officer Green testified that he believed this indicated defendant was stalling so that he could think of what to say. Officer Green testified he knew that defendant clearly heard the question as he had asked defendant to roll up the driver side window to screen the traffic noise from I-85 and make it quieter for their conversation. After the question was asked again, defendant informed Officer Green that he was coming from Queens, New York. Officer Green then asked defendant again about his destination and received another "huh" as his answer. Upon the second or third time defendant was asked about his destination, defendant claimed he did not know where he was going but had an address in the GPS of his phone. Defendant could not even provide the city where that address was located. Officer Green then asked if defendant had been to North Carolina before, to which defendant replied that this was his first trip.
 

 Officer Green again asked where he was going and defendant could not, or would not, tell Officer Green his destination. At that point Officer Green concluded that defendant clearly did not want to tell him where he was going. Officer Green testified that he felt this was very strange for in 15 years of stopping people, they always knew where they were coming from and where they were going. Officer Green testified this was the first time someone ever told him that they did not know their destination, but had a destination address locked into the GPS on their phone. Officer Green testified that defendant informed him it was Big Tree Way, but he did not know the city in which this address was located; defendant
 
 *330
 
 only knew it was about an hour away. Given the facts that defendant had answered his questions with "huh" repeatedly and could not, or would not, disclose his destination, Officer Green began to believe that there was criminal activity involved. This belief arose before Officer Green asked defendant to exit his vehicle, submit to a pat down for weapons, and sit in his patrol vehicle.
 

 The patrol vehicle was outfitted with both an in-car camera system to record the inside of the patrol vehicle and a forward-facing camera system to record what the driver would see in front of the patrol vehicle. The entire video of Officer Green's interaction with defendant was entered into evidence and played for the trial court judge.
 

 That video showed that while in the process of entering defendant's information and that of the registered owner, Officer Green asked defendant about the odor of marijuana that he now detected. Defendant answered that he had smoked about three days ago and that some of his friends smoked, and that is what Officer Green might have smelled. Then later, while the officer is still processing the defendant's name, registration, and routine information, defendant volunteered that he had been arrested for DUI in New York due to his driving while under the influence of marijuana, an experience defendant said he had learned from. While in the patrol vehicle, Officer Green also had defendant repeat his story about not knowing the city of his destination but that he had an address locked into the GPS of his phone and he was about an hour away. Officer Green then asked who defendant was going to see and defendant said "Eric." But when asked Eric's last name, defendant said he did not know. Defendant explained that he was going to see Eric, hang out for a few days, and go back to New York in the car he had borrowed from another friend. All of this occurred well before Officer Green learned from dispatch that there were no warrants for defendant.
 

 Officer Green further testified that he had to change to the police channel in case the department was doing a safety check and then go back to dispatch to get information about warrants. Officer Green also ran the
 
 *51
 
 names of the owner of the vehicle and defendant through the El Paso Intelligence Center ("EPIC") before printing out a warning ticket, although Officer Green had already informed defendant that he was going to receive a warning ticket long before the ticket was actually printed.
 

 As Officer Green handed defendant the warning ticket, Officer Green asked defendant if he had any marijuana in the car, noting that he had smelled marijuana on defendant and defendant had admitted
 
 *331
 
 to the marijuana-based DUI. Defendant denied there was any marijuana in the car and said, "[y]ou can search, if you want to search." The ensuing search discovered a quantity of heroin and cocaine in a trap door under the center console. As the officers are locating the drugs, defendant is heard muttering "they found it" on the video recording.
 

 After his arrest, defendant was indicted on 3 November 2014 and a suppression hearing was held on 20 April 2015. The trial court entered an order allowing defendant's suppression motion on 22 April 2015, from which the State now appeals. The trial court ruled that Officer Green unnecessarily extended the traffic stop without reasonable suspicion and that defendant had not given clear and unequivocal consent to search his vehicle.
 

 II.
 
 Standard of Review
 

 "The standard of review for a motion to suppress is whether the trial court's findings of fact are supported by the evidence and whether the findings of fact support the conclusions of law."
 
 State v. Wainwright,
 
 ---N.C.App. ----, ----,
 
 770 S.E.2d 99
 
 , 104 (2015) (internal quotation marks and citation omitted).
 

 Whether a defendant has voluntarily consented to a search is determined after a review of the totality of the circumstances surrounding the obtaining of consent.
 
 State v. Smith,
 

 346 N.C. 794
 
 , 798,
 
 488 S.E.2d 210
 
 , 213 (1997). Consent in the context of searches and seizures "means a statement to the officer, made voluntarily and in accordance with the requirements of [N.C. Gen.Stat. § ] 15A-222, giving the officer permission to make a search." N.C. Gen.Stat. § 15A-221(b) (2015).
 

 III.
 
 Analysis
 

 Here, the trial court properly found that Officer Roy Green, a 15-year veteran of the Durham Police Department serving in the interdiction unit of the special operations division, stopped a vehicle driven by defendant with reasonable suspicion that defendant was speeding in violation of N.C. Gen.Stat. § 20-141. The validity of the initial traffic stop is not at issue in this case. The problem with the trial court's order stems from a misunderstanding of the United States Supreme Court's recent decision in
 
 Rodriguez v. United States,
 
 --- U.S. ----,
 
 135 S.Ct. 1609
 
 ,
 
 191 L.Ed.2d 492
 
 (2015), which held that even a
 
 de minimis
 
 extension of a valid traffic stop is a violation of the Fourth Amendment's prohibition against unreasonable searches and seizures absent reasonable suspicion. Understanding exactly what
 
 Rodriguez
 
 permits and what
 
 Rodriguez
 
 prohibits is important. Thus, we re-visit the facts of
 
 Rodriguez
 
 and the legal standards applied in the Eighth Circuit at the time of the
 
 Rodriguez
 
 traffic stop.
 

 *332
 
 In
 
 Rodriguez,
 
 a canine police officer, who had his dog with him in his patrol vehicle, stopped a vehicle after observing it veer slowly onto the shoulder of the road and then "jerk" back onto the road.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1612
 
 . The defendant in
 
 Rodriguez
 
 was driving the vehicle and there was a passenger in the front passenger seat.
 

 Id.
 

 Upon approaching the passenger side of the vehicle, the officer inquired why the defendant had driven onto the shoulder and the defendant replied that he had swerved to avoid a pothole.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 . Resolving the separate issue of whether the officer had reasonable suspicion to extend the traffic stop, an issue the majority did not reach and sent back for consideration by the Eighth Circuit, Justice Thomas added that "[the defendant's] story could not be squared with [the officer's] observation of the vehicle slowly driving off the road before being jerked back onto it."
 

 iD.
 

 at ----, 135 s.CT. at 1622 (THomas, j., dissenting). tHe officer then took the defendant's license, registration, and proof of insurance to his patrol vehicle and ran a records check on the defendant.
 

 *52
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613
 
 . Upon completion of the records check on the defendant, the officer returned to the defendant's vehicle, asked the passenger for his driver's license, and questioned the passenger concerning their route and reason for traveling.
 

 Id.
 

 The passenger responded that they had gone to Omaha to look at a vehicle for sale and were returning to Norfolk.
 

 Id.
 

 The officer then returned to his patrol vehicle to run a records check on the passenger.
 

 Id.
 

 The officer also called for a second officer at that time.
 

 Id.
 

 Upon completion of the second records check, the officer wrote a warning ticket for the defendant for driving on the shoulder and returned to the defendant's vehicle to issue the warning ticket.
 

 Id.
 

 After issuing and explaining the warning ticket and returning the defendant's and the passenger's documents, the officer then asked for permission to walk his dog around the defendant's vehicle, a request the defendant refused.
 

 Id.
 

 At that time, the officer directed the defendant to turn off and exit the vehicle.
 

 Id.
 

 When a deputy sheriff arrived a few minutes later, the officer retrieved his dog from his patrol vehicle and led the dog around the defendant's vehicle.
 

 Id.
 

 The dog alerted and drugs were discovered during a subsequent search of the defendant's vehicle.
 

 Id.
 

 The district court denied the defendant's motion to suppress, noting that "in the Eighth Circuit, dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only
 
 de minimis
 
 intrusions."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1613-14
 
 (internal quotation marks omitted). The Eighth Circuit affirmed that the delay in the traffic stop "constituted an acceptable
 
 de minimis
 
 intrusion on [the defendant's] personal liberty" and declined
 
 *333
 
 to address whether the officer had reasonable suspicion to extend the stop.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1614
 
 (internal quotation marks omitted). The U.S. Supreme Court granted
 
 certiorari
 
 and then vacated the judgment of the Eighth Circuit and remanded the case for the Eighth Circuit to consider whether there was reasonable suspicion to detain the defendant beyond the completion of the traffic stop.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1616-17
 
 . Upon remand the Eighth Circuit applied the "good-faith exception" and upheld the defendant's conviction.
 
 United States v. Rodriguez,
 

 799 F.3d 1222
 
 (8th Cir.2015).
 

 It is important to examine exactly what guidance the Court provided in
 
 Rodriguez.
 
 There Justice Ginsburg explained:
 

 A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called "
 
 Terry
 
 stop" than to a formal arrest. Like a
 
 Terry
 
 stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"-to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are-or reasonably should have been-completed.
 

 Our decisions in
 
 Caballes
 
 and
 
 Johnson
 
 heed these constraints. In both cases, we concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. In
 
 Caballes
 
 , however, we cautioned that a traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. And we repeated that admonition in
 
 Johnson
 
 : The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But ... he may not do so in a way that prolongs the stop,
 
 absent the reasonable suspicion ordinarily demanded to justify detaining an individual.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1614-15
 
 (internal quotation marks, citations, brackets, and ellipses omitted) (emphasis added).
 

 *334
 
 At the outset it should be noted that while a person has been seized during a traffic stop, that seizure is permissible when based upon reasonable suspicion and statements
 
 *53
 
 made during the course of a traffic stop are not custodial statements requiring
 
 Miranda
 
 warnings.
 
 Berkemer v. McCarty,
 

 468 U.S. 420
 
 , 437-42,
 
 104 S.Ct. 3138
 
 , 3148-51,
 
 82 L.Ed.2d 317
 
 , 332-36 (1984). While such has long been the law, defense counsel in the present case argued that Officer Green should have given defendant a
 
 Miranda
 
 warning before asking any questions. The trial court then issued Conclusion of Law 12, which provides, "[Officer] Green did not advise defendant of his rights pursuant to
 
 Miranda
 
 , and defendant did not waive them."
 
 Miranda
 
 , however, is inapplicable under the circumstances of this case as defendant was not asked any questions post-arrest. All of the questions asked of defendant were during the traffic stop itself and, for the most part, related to the traffic stop, such as route information, vehicle ownership, purpose of the trip, odors emanating from defendant, or responses to questions from defendant, such as whether there were deer along the highway.
 

 In reviewing the guidance from
 
 Rodriguez,
 
 it is clear that a traffic stop may not be unnecessarily extended, "
 
 absent the reasonable suspicion ordinarily demanded to justify detaining an individual.
 
 "
 
 Rodriguez,
 
 --- U.S. at ----,
 
 135 S.Ct. at 1615
 
 (emphasis added). In determining whether a stop was unnecessarily extended, the purpose of the stop is paramount. Unrelated investigation is not necessarily prohibited, but extending the stop to conduct such an investigation is prohibited. The question then arises, "When does reasonable suspicion arise?" In
 
 Rodriguez,
 
 the majority opinion made no determination on the issue of reasonable suspicion and remanded the case to the Eighth Circuit to consider the issue.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1616-17
 
 .
 

 "[A] trial court's conclusions of law regarding whether the officer had reasonable suspicion [or probable cause] to detain a defendant is reviewable
 
 de novo.
 
 "
 
 State v. Hudgins,
 

 195 N.C.App. 430
 
 , 432,
 
 672 S.E.2d 717
 
 , 718 (2009) (internal quotation marks and citations omitted). Thus, we review
 
 de novo
 
 the trial court's conclusion in this case that Officer Green lacked reasonable suspicion prior to running the defendant's name through other databases after learning there were no warrants for defendant.
 

 Our Supreme Court has long recognized that "reasonable suspicion" is a relatively low threshold and should be viewed through the eyes of a reasonable officer, giving the officer credit for his training and
 
 *335
 
 experience. In
 
 State v. Williams,
 

 366 N.C. 110
 
 ,
 
 726 S.E.2d 161
 
 (2012), our Supreme Court explained:
 

 An officer has reasonable suspicion if a reasonable, cautious officer, guided by his experience and training, would believe that criminal activity is afoot based on specific and articulable facts, as well as the rational inferences from those facts. A reviewing court must consider the totality of the circumstances-the whole picture. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. While something more than a mere hunch is required, the reasonable suspicion standard demands less than probable cause and considerably less than preponderance of the evidence.
 

 Id.
 
 at 116-17,
 
 726 S.E.2d at 167
 
 (internal quotation marks and citations omitted). Applying this reasonable suspicion standard to the circumstances in
 
 Williams,
 
 our Supreme Court determined the officers involved had reasonable suspicion to justify extending a stop until a canine unit arrived where the occupants of a car they stopped gave inconsistent and unlikely travel information, could not explain where they were going, gave inconsistent statements concerning their familial relationship, and the vehicle with illegally tinted windows was owned by a third person.
 
 Id.
 
 at 117,
 
 726 S.E.2d at 167
 
 . The Court further explained that while the factors may not support a reasonable suspicion of criminal activity when viewed individually and in isolation, when "viewed as a whole by a trained law enforcement officer who is familiar with drug trafficking and illegal activity on interstate highways, the responses were sufficient to provoke a reasonable articulable suspicion that criminal activity was afoot[.]"
 

 Id.
 

 *54
 
 Another case demonstrating that a series of innocent factors, when viewed collectively, may rise to the level of reasonable suspicion is
 
 State v. Fisher,
 

 219 N.C.App. 498
 
 ,
 
 725 S.E.2d 40
 
 (2012),
 
 disc. rev. denied,
 

 366 N.C. 425
 
 ,
 
 759 S.E.2d 83
 
 (2013). In
 
 Fisher,
 
 the State argued the following factors established reasonable suspicion that the defendant was transporting contraband:
 

 (1) there was an overwhelming odor of air freshener coming from the car; (2) defendant's claim that he made a five hour round trip to go shopping but had not purchased anything; (3) defendant's nervousness; (4) defendant had
 
 *336
 
 pending drug related charges and was known as a distributor of marijuana and cocaine in another county; (5) defendant was driving in a pack of cars; (6) defendant was driving a car registered to someone else; (7) defendant never asked why he had been stopped; (8) defendant was "eating on the go"; and (9) there was a handprint on the trunk indicating that something had recently been placed in the trunk.
 

 Id.
 
 at 502-03,
 
 725 S.E.2d at 44
 
 . This Court explained that
 

 [t]he specific and articulable facts, and the rational inferences drawn from them, are to be viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. In determining whether the further detention was reasonable, the court must consider the totality of the circumstances. Reasonable suspicion only requires a minimal level of objective justification, something more than an unparticularized suspicion or hunch. We emphasize that because the reasonable suspicion standard is a commonsensical proposition, [c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.
 

 Id.
 
 at 502,
 
 725 S.E.2d at 43
 
 (internal quotation marks and citations omitted). Then, upon review of the factors argued by the State, and despite noting that some of the factors could be construed as innocent behavior, this Court held the trial court erred in determining reasonable suspicion did not exist because multiple other factors present in the case were sufficient to establish reasonable suspicion.
 
 Id.
 
 at 504,
 
 725 S.E.2d at 45
 
 . Specifically, the trial court noted "nervousness, the smell of air freshener, inconsistency with regard to travel plans, and driving a car not registered to the defendant."
 

 Id.
 

 (internal citations omitted).
 

 Federal reasonable suspicion cases are also instructive in the present case. Two of those cases are
 
 United States v. Carpenter,
 

 462 F.3d 981
 
 (8th Cir.2006), and
 
 United States v. Ludwig,
 

 641 F.3d 1243
 
 (10th Cir.2011).
 

 In
 
 Carpenter,
 
 a defendant driving a vehicle with Texas plates exited the interstate highway in Phelps County, Missouri immediately after a sign warned of a drug check point ahead.
 
 462 F.3d at 983
 
 . The defendant then drove for a distance before pulling to the shoulder of the road.
 

 Id.
 

 When an officer approached the defendant, the defendant claimed
 
 *337
 
 he was looking to refuel even though he had a quarter of a tank of gas and there were no service stations at the exit.
 

 Id.
 

 at 983-84
 
 . The defendant also claimed to be traveling from Austin, Texas, to New York, but the rental agreement for the vehicle showed the vehicle was rented in El Paso.
 

 Id.
 

 After another deputy arrived with a trained drug detection dog, the dog was walked around the defendant's vehicle and alerted.
 

 Id.
 

 at 984
 
 . The officer than searched the vehicle and found cocaine, leading to the defendant's arrest.
 

 Id.
 

 In reviewing whether there was reasonable suspicion, the Eighth Circuit explained as follows:
 

 We consider the totality of circumstances in evaluating whether there was reasonable suspicion that criminal activity was afoot. Reasonable suspicion is a lower threshold than probable cause and it requires considerably less than proof of wrongdoing by a preponderance of the evidence. The behavior on which reasonable suspicion is grounded, therefore, need not establish that the suspect is probably guilty of a crime or eliminate innocent interpretations of the circumstances. Factors consistent with innocent travel, when taken together, can give rise to reasonable suspicion, even though some travelers exhibiting those factors will be innocent. To justify a seizure, however, the officer must
 
 *55
 
 have a minimal level of objective justification and something more than an inchoate and unparticularized suspicion or hunch. And the ultimate test is not what the seizing officer actually believed, but what a hypothetical officer in exactly the same circumstances reasonably could have believed.
 

 Id.
 

 at 986
 
 (internal citations and quotation marks omitted). The Court then held that the totality of the facts in the case provided reasonable suspicion to justify the detention of the defendant until the drug dog arrived.
 

 Id.
 

 at 987
 
 .
 

 In
 
 Ludwig,
 
 a Wyoming state trooper initiated a stop of the defendant's car for speeding.
 
 641 F.3d at 1246
 
 . The defendant pulled onto the shoulder of the highway but, strangely, continued driving for a considerable distance on the shoulder before stopping.
 

 Id.
 

 When the trooper approached the car, he smelled a strong odor of cologne and noticed the defendant was trembling so badly that he had difficulty producing his driver's license.
 

 Id.
 

 The trooper then had the defendant accompany him to his patrol car while he wrote the defendant a speeding ticket, during which time the trooper asked about the defendant's travel plans.
 

 Id.
 

 The
 
 *338
 
 defendant advised he was an "IT administrator" and had traveled from New Jersey to San Jose, California, to deal with a "server problem" and was now returning to New Jersey.
 

 Id.
 

 The defendant also stated that he chose to drive instead of flying, had stayed in California for only four days, and had spent the last night in his car.
 

 Id.
 

 The registration and proof of insurance for the defendant's car were not in defendant's name.
 

 Id.
 

 The trooper found the circumstances suspicious and after writing a ticket, detained the defendant for further investigation.
 

 Id.
 

 A drug dog then alerted to the defendant's car and drugs were found during a search.
 

 Id.
 

 In reviewing the district court's denial of the defendant's motion to dismiss, the Tenth Circuit held that the combination of considerations which have been recognized in other cases to contribute to reasonable suspicion led it to hold the reasonable suspicion standard was satisfied.
 

 Id.
 

 at 1248-50 (citing
 
 United States v. Villa-Chaparro,
 

 115 F.3d 797
 
 , 799, 802 (10th Cir.1997) (failure to promptly stop);
 
 United States v. Ortiz-Ortiz,
 

 57 F.3d 892
 
 , 895 (10th Cir.1995) (masking odors);
 
 United States v. Turner,
 

 928 F.2d 956
 
 , 959 (10th Cir.1991) (third-party registration);
 
 United States v. White,
 

 584 F.3d 935
 
 , 943, 951 (10th Cir.2009) and
 
 United States v. Sokolow,
 

 490 U.S. 1
 
 , 9,
 
 109 S.Ct. 1581
 
 , 1586,
 
 104 L.Ed.2d 1
 
 , 11 (1989) (suspect travel schedule);
 
 United States v. Williams,
 

 271 F.3d 1262
 
 , 1269 (10th Cir.2001) (extreme nervousness)).
 

 As stated earlier, the determination of reasonable suspicion is a conclusion of law which we review
 
 de novo.
 
 In analyzing the facts of the case at bar, we note that a number of factors deemed relevant in
 
 Carpenter
 

 , Ludwig
 
 , and other cases cited herein were present and were known to Officer Green before he had defendant join him in the patrol vehicle-an unusual story regarding his travel as he did not know his destination or was concealing it,
 
 United States v. White,
 
 supra;
 

 a masking odor,
 
 United States v. Ortiz-Ortiz,
 
 supra;
 

 third-party registration,
 
 United States v. Turner,
 
 supra;
 

 and nervousness,
 
 United States v. Williams, supra.
 
 These factors were known to Officer Green while he stood on the roadside before defendant joined him in the patrol vehicle. Then while running defendant's name for warrants in the patrol vehicle, an action permitted in
 
 Rodriguez,
 
 the officer smelled marijuana on defendant's person and learned from defendant that defendant had a DUI based on his own marijuana usage. The trial court's conclusion that Officer Green lacked reasonable suspicion despite all of these factors discussed herein is incorrect. It bears repeating that reasonable suspicion is a common sense determination made by a reasonable officer, giving the officer credit for his training and experience and viewing the totality of the circumstances. While there might be someone who would borrow a car, drive eleven hours to "hang out" with a friend named Eric
 
 *339
 
 at an unknown location, spend a few days and return, it is a rather bizarre story. Reasonable suspicion does not depend on a proven lie, but is based on the totality of the circumstances. Based on defendant's bizarre travel plans, his extreme nervousness, the use of masking odors, the
 
 *56
 
 smell of marijuana on his person, and the third-party registration of the vehicle, it is reasonable that even an untrained person would doubt defendant's story, much less a fifteen-year veteran with interdiction training. Thus, we hold that Officer Green had reasonable suspicion to extend the stop and could run such ancillary records checks as he believed reasonable until his investigation was complete. The time it took for him to complete what is described in his testimony as a "pipeline" check and an EPIC check were both done relatively quickly and, when the warning ticket was issued, there had been no unreasonable extension of the stop.
 

 The trial court issued conclusions of law that were phrased in the alternative and, thus, are somewhat confusing. For instance, Conclusion of Law 4 provides:
 

 4. Even if the stop was reasonable in scope and duration up to the point of the issuance of the warning ticket, the extension of the stop after the issuance of the warning ticket was also unreasonable in both scope and duration, without reasonable suspicion to believe that criminal activity was afoot.
 

 This conclusion of law is expressly overruled as we have held that the evidence clearly showed that Officer Green had reasonable suspicion from the time he and defendant sat down in the patrol car.
 

 Not only did Officer Green not unreasonably extend the stop, shortly after the warning ticket was written and as Officer Green handed the ticket to defendant, Officer Green, in light of smelling marijuana and defendant's admission to using marijuana, asked whether there was any marijuana in defendant's vehicle. Defendant denied there was anything in the car stating, "you can search if you want to search." The trial court found that Castillo stated that the officer could search, yet concluded consent was not freely given. It appears the trial court may have concluded that consent was not freely given because the trial court judge misunderstood the law and did not have the sequence of events in their correct order. The trial court's order contains the following findings of fact:
 

 31. Approximately seventeen minutes into the stop, Green received word from Durham dispatch that there were no outstanding warrants for the driver.
 

 *340
 
 32. Approximately thirty-seven minutes into the stop, Green printed out a warning ticket for speeding.
 

 33. At that point, Green told defendant to sit tight or otherwise indicated he wished him to remain in the vehicle. Green did not seek or gain consent for the extension of this stop. There was no point throughout the encounter in which Green indicated, verbally or otherwise, that defendant was not required to remain with the officer. At no point did Green let defendant know he was free to leave.
 

 The trial judge then made Finding of Fact 34, which provides in pertinent part that "Green asked defendant if there was any marijuana in the car, but did not specifically seek permission to search the vehicle. The defendant responded negatively, and told the officer, 'you can search if you want to search.' "
 

 In making these findings, the trial judge had the sequence of events out of order. In fact, it was after defendant informed Officer Green that the officer could search if he wanted to that Officer Green told defendant to "sit tight [,]" as recounted in Finding of Fact 33. If the officer had in fact detained defendant without reasonable suspicion and ordered him to "sit tight [,]" perhaps one could conclude that consent was not freely and unequivocally given. While the issue of valid consent may be an issue of fact, that determination must be founded upon a correct factual basis. Ultimately these facts must support a conclusion of law that consent was or was not freely given.
 
 See
 

 State v. Brown,
 

 306 N.C. 151
 
 , 169-71,
 
 293 S.E.2d 569
 
 , 581-82 (1982). In the case at bar, the defendant clearly stated "you can search, if you want to search[,]" after which, not before, Officer Green tells defendant to "sit tight" and retrieves his gloves from the back seat of his patrol vehicle before beginning the search of defendant's vehicle. Thus, the trial court's Conclusion of Law 9, wherein the court concluded defendant's consent was not clear and unequivocal, is premised on both incorrect
 
 *57
 
 facts and a misunderstanding of the law. As such, the court's conclusion of law is clearly erroneous.
 
 See
 

 State v. Smith,
 

 346 N.C. 794
 
 , 799-800,
 
 488 S.E.2d 210
 
 , 213-14 (1997). In
 
 Smith,
 
 our Supreme Court held the trial court erred in concluding the defendant's consent was not voluntary because it appeared that the trial judge believed that the "knock and talk" law enforcement technique was unconstitutional.
 

 Id.
 

 Furthermore, the Court reversed because the trial court did not make a specific finding that consent was voluntary.
 

 Id.
 

 In the present case, it appears the trial judge believed that Officer Green lacked reasonable suspicion to extend the stop and the unlawful extension impinged on defendant's ability to consent. Additionally, it
 
 *341
 
 appears the trial court misunderstood the correct sequence of events. As a result, the trial court's factual findings do not support the conclusion of law that "defendant did not give lawful consent for the search." The trial court's conclusion is subject to reversal.
 

 The case at bar is very similar to that of
 
 U.S. v. Cardenas-Alatorre,
 

 485 F.3d 1111
 
 , 1118-20 (10th Cir.2007), in which the Court held the district court's finding of voluntary consent was not clearly erroneous based on video of the encounter that showed no evidence of coercion and that the defendant continued to respond to officer's questions.
 
 485 F.3d at 1118-20
 
 . Similarly, the entire encounter between Officer Green and defendant in this case was recorded on video. On the video, defendant can be clearly heard telling Officer Green he can search and talking to Officer Green and other officers during the search. There is no evidence to suggest defendant's consent was anything but voluntary and, therefore, we hold the trial court's conclusion that "defendant did not give lawful consent" is clearly erroneous.
 

 IV.
 
 Conclusion
 

 In conclusion, we hold Officer Green had reasonable suspicion to extend the traffic stop prior to entering his patrol vehicle with defendant. Thus, the traffic stop was not unlawfully extended. We also hold the trial court's conclusion that defendant's consent was not clear and unequivocal was based on a misapprehension of both the law and the factual sequence of events and, thus, was clearly erroneous. Consequently, we reverse the trial court's order suppressing the evidence in this case and remand the case to Durham County Superior Court for trial.
 

 REVERSED.
 

 Judges BRYANT and GEER concur.